You may begin whenever you're ready. Thank you, Your Honor. May it please the Court, my name is Phil Colare and I represent the IDEOC Administrators Brent Reinke, Rona Siegert, Randy Blades, and Jimmy Crosby in this matter. This appeal addresses a decision by the District Court to deny the individual Administrators claim to qualified immunity. As an initial point, I wanted to, I think that's important, is to point out when our initial motion for summary judgment was filed. The plaintiff made a number of concessions that are very important, but they conceded that everyone who had personal interaction or saw this individual, Mr. Bown, on the day of his heart attack, namely the Correctional Officers who interacted with him and the nurse, Ms. Cassie Richens, who initially assessed him, did not act unconstitutionally. They conceded the summary judgment argument on those, as to those people. So what we have here, as we came to the District Court and the qualified immunity issues with the administrators, is everybody who interacted with this person personally, face-to-face, did not violate his Eighth Amendment rights. Now, they do contend that the District Court, when the plaintiff came to the District Court and was making decisions about whether he should be transported to the hospital or not, they do not concede that she acted constitutionally. They contest that. She is not one of the appellants here. She is not. These are all either wardens or, you know, way up the chain, supervisory liability being alleged. That is true. What we have here, this case, is limited to supervisory administrator liability only. The District Court found a based its decision upon the existence of a systemic deficiency that he contended, that he believes, violated the Eighth Amendment. The issue identified by the District Court was a factually mistaken conclusion that EKG studies that are conducted at IMSI, the Maximum Security Institution, on the weekends could not be immediately interpreted. Well, let me just get to the chase. As I understood it, the court said there were two problems. One was nobody to read EKGs on the weekend and a policy about transporting or not transporting inmates. But, even assuming the court was correct about that, I guess my question to both counsel is what is the specific connection of these individuals shown in in this record to those policies that the court found problematic? I did not myself see evidence that any of them was connected to either of those policies in a factual way. And I'd appreciate having both of you address that. And that was my next point I was going to put, bring up, Your Honors. I'm going to address that I disagree with the courts, the District Court's, finding of a systemic deficiency. But even if when you assume that one existed, what is lacking in the District Court's opinion, or any of the briefing or argument from the other side, addresses the issue of personal participation of the individual administrators. But as I understand it, looking at the record, the claim is that defense counsel very strongly obstructed the efforts of plaintiff's counsel to develop, to engage in the type of discovery that could have led them to amend the complaint, or at least more properly and completely respond to the summary judgment. Defense filed the summary judgment motion. The plaintiffs came back with a motion to stay, I don't recall specifically if it was under Rule 56, but basically saying, look, they've obstructed every effort on our part to develop discovery in this case. Please let us conduct this discovery before we respond. The judge denied the motion for summary judgment, but didn't didn't give them the opportunity to respond to that. Did he? Isn't, wasn't, weren't there, hadn't there been a motion to compel? Entered here, hadn't the judge already ordered sanctions of over $43,000 against defense counsel for obstructing the discovery process? I think he referred to it as a miserable slog. Well, what occurred, it was dealt with, what the judge was dealing with, was the ESI discovery. What was produced, and it's undisputed, these are the discovery that is germane to the constitutional issues here, is back in June of 2015, the OPS internal investigation report dealing with this incident was produced. That's over a year prior to the summary judgment. In October of 2015, the, the inmate medical grievances, concern forms, are produced. My understanding is they had made requests to, for information, communications between IDOC and the medical provider, the opportunity to take depositions, and that those had not occurred because, because the defense was dragging its feet. Am I mistaken in that? You are mistaken. Okay. The, the depositions of the, all the administrators, with the exception of Rona Sigert, have been done. The ESI discovery they are focusing on deals with audits and sank, and, and liquidated damages that were assessed against the medical provider, Corizon, in the years prior. Before the motion for summary judgment was filed? Yes, those were done. And I think it's important to note that in the audit reports that they were, that they have, that they've been produced before, the summary judgment was produced, was done, and as part of our summary, the summary judgment presentation, the audit deficiencies that were found at IMSI, the prison at issue, were limited to two issues. Unrelated to Mr. Bone, one dealt with the number of signatures on the narcotics log, and the other dealt with the, Corizon was not completely filling out the discharge planning forms. When it, when an inmate is just going to be released, there's a discharge, a follow-up planning form, given to them so they can seek medical care in the community after they're discharged. That wasn't being completely filled out. You're saying that the plaintiffs had a full and fair opportunity before they had a duty to respond to the summary judgment, to gather the evidence that was appropriate for them to rely on in filing their response? Absolutely. Absolutely. And they also have, and I, and I, I think we come back to the question of the underlying so-called systemic deficiency here, is whether or not the medical delivery system can appropriately, is it, is it constitutionally appropriate to utilize an electronic interpretation rather than to have an actual individual read the strip and and that's, that's what the, that's the factual error that the district court made, is he concluded there was no interpretation. Well, there was. Do we have to agree with you on whether the court made a factual error in order for your clients to prevail? No, I don't think so, but I think it's pretty clear the district court said there was no interpretation. Well, there wasn't. What you have in the. As I understand it, there was no one on site that interpreted it. Who was capable of reading it. At that point. In its entirety because of the inability to convey the ST elevations in the, in the. The actual strip, that's true, but you have, you have the, the actual electronic interpretation and it very clearly diagnoses the heart attack. The plaintiff's own expert witnesses testified that the electronic interpretation accurately identifies and diagnoses the heart attack. And I think what's important is I see the obligation of a medical delivery system under this court's ruling in Hoptuit versus Ray, is there has to be a system that affords the inmate ready access to medical care. Meaning, they have to be able to be seen by somebody that can assess them or the person that does assess them has the ability and the discretion to refer them to somebody who can. That happened. The question is, when, as is recognized by the plaintiff's own experts, when the physician's assistant was read verbatim the electronic interpretation was told what the patient's symptoms, what they were exhibiting, meaning he was complaining of chest pain, he was sweating, he had pain radiating down his left arm, and he was complaining of nausea, coupled with the electronic interpretation. At that point, according to their own experts, that, that medical provider who is qualified, licensed to make this decision of whether to provide the information she needed to make that decision and should have ordered the transport. So according to that, you never even reached the second point, the second systemic issue of not having a protocol for sending to the hospital, because you're saying because of all this, they was, they would have sent in any event. And the idea that there is not a protocol for sending the hospital is untrue. What the protocol is, is the medical provider makes that decision. Security staff does not, and they cannot override the medical decision. The person with the discretion and the authority to decide this patient should not be treated, has a condition that can't be treated here at the prison, needs to go to the hospital, that was the on-call medical provider. That was Ms. Barrett. Well, maybe ultimately, you know, the correct medical diagnoses and the determinations and decisions were made, but the fact is there were significant delays, right? There was. What the, the decision that Ms. Barrett made was she discounted the EKG interpretation in favor of drawing blood for cardiac enzymes. Well, that cardiac, the blood draw, then has to be driven into the hospital, the same place the patient would have gone if he's transported for testing. When the nurse, Ms. Richens, drew the blood, she calls the hospital to make sure it's in the right colored test tube. They tell her it needs to be in a green test tube. She goes, grabs a green test tube, draws the blood and places it in there. Unfortunately, evidently, there's different shades of green. And when it gets to the hospital, it's in the wrong colored tube from their perspective, and they don't test it. They don't call. Ms. Richens finishes work she's doing in a couple, in an hour or two, and then calls the hospital for the results and finds out. Is there any anything in the record indicating that any of the defendants before us on appeal were aware of that or had any connection to that delay? Absolutely none. The individual administrators had no, they weren't there. They had no knowledge any of this was going on. What is very clear, and from their own, from the testimony of Mr., that we have in this record, the record about that dealing with the the individuals is limited to their their complaint, where they allege, where we asked them, where they allege that they failed to oversee Corizon in its interpretation of EKG testing and suggest the contract should have been terminated. That doesn't meet the Iqbal standards. We then sent them discovery and asked them contention interrogatories for each individual administrator saying, what did they do wrong? And they come back with the same basic elements of an Eighth Amendment violation. We take Mr. Bone's deposition, and we ask him these same basic questions. And he admits a number of things, three key things. First, he admits none of the individuals were personally involved in the medical care, and it's true, none of them ever seen him. They've never seen his medical file. There's no reason for them to see his medical file. Second, he admits that none of the individuals did anything that influenced the medical decisions that were made on the day that he had his heart attack. Third, he admits that none of the individuals were in possession of any information that could have alerted them that the medical care he received that day was going to be substandard in some fashion. Counsel, you're down to under a minute. Did you want to save some rebuttal time? I would, Your Honor. Thank you. Thank you. Good morning. Good morning, Your Honor. May it please the Court. John Robinson, Jackson, Wyoming, representing Mr. Bowne in this matter. In February of 2011, Mr. Bowne had a heart attack while at the prison in Boise, Idaho. And his transport to the hospital was delayed by more than five hours, primarily and precisely because the defendants, appellees here, did not require the medical provider to have a person on site after hours or on weekends to interpret an EKG. In a generic sense, the entity did not. But as I see this, I don't see any specific culpable action or inaction that there's evidence about of any of these individuals being responsible for the two policies that the district court identified as being problematic. It's not enough to just say, well, you're the warden of the prison and things got messed up under your watch. It has to be, it seems to me, more precise than that. Well, in the record, Your Honor, it's undisputed that it was the policy of this prison and this horizon, the healthcare provider, to have no one on staff on the weekends or after hours to read an EKG. It was also the policy. But that's a prison policy. And I guess what I'm trying to find out is what, other than saying you're the warden or you're the, way the head of the Department of Corrections, what is the connection between these individuals and that policy? And were they aware, is there anything in the record that shows that they were aware that having such a policy, if there was one, was likely to cause an Eighth Amendment violation, that they were aware of a problem and ignored it? Well, when this case was appealed, we were in the process of trying to engage in that discovery. As Judge Mim noted, there was substantial obstruction that went on. I'm sorry, go ahead. I'll try to answer the best I can, Your Honor. I just wanted to point out, though, that as I read the district court's opinion, the court is not granting or denying qualified immunity as a sanction. So whether there was obstruction earlier or not, as I read the court's decision, it was, I'm looking at the facts and I don't see qualified immunity. So I'm not sure what the relevance is for myself. Just so the record's clear here, no, the district court made a decision based upon disputed facts. There's no question about that. I'm just saying that there were disputed facts from which a jury could determine that these appellees could be held responsible for what happened to Mr. Bowne and the delay in getting him to the hospital. Now, I want to make sure that the court is aware of the fact that when we had not deposed Ms. Siegert, who was the person primarily responsible for overseeing Corizon, we had been seeking all the communications between Corizon and the Department of Corrections and those had not been produced. In fact, what we learned in discovery was most of it had been destroyed and the court made a finding on the destruction of those records that there would almost certainly be an adverse inference instruction given to the jury that because of the destroyed communications, those could be considered to be adverse to the defendants. Mr. Robinson, I think your opponent's position is that nothing in the record ties any individual defendant to any act of wrongdoing that contributed to the heart attack or to the lack of treatment for the heart attack. Now, can you, for instance, like, oh, let's take one of the defendants, the first one was Reinicke, he's the warden, right? He was the director of the Department of Corrections at the time. Now, what did he do or didn't do that he should have done that contributed to this lack of treatment? That's in the record. There was either a policy or a lack of a policy, right, on this issue. Now, does the record show who was responsible over that area of prison operation? In other words, who should have promulgated the policy? Well, I think there is in the record an affidavit from Ms. Siegert. We didn't get to depose Ms. Siegert. I'm not interested in who he deposed. I want to know what's in the record. In the record, Ms. Siegert has submitted an affidavit indicating that she was responsible for supervising the manner in which Corizon operated its contract to deliver the health care. And this was one of Corizon's responsibilities, right? To do something, you know, have adequate staffing on the weekends, and so forth. Yes, sir. All right, so it was her responsibility as an official of the Idaho Department of Corrections to make sure Corizon had proper... She was responsible for over... Now, assuming that's enough, what is there to hold the other defendants? Well, Mr. Ranke was the director of the Department of Corrections, and I think... What should he have done? Fired her? Well, it's our position that they can't delegate this obligation to provide emergency care. Well, if they can't delegate it, then it's not her fault. So the director of the entire department has to be aware of every policy in every prison and is to be personally responsible? That seems to me quite counter to the cases on supervisory liability, that you are not responsible for the problems of your subordinates. You have to be personally either... There's either an act or an omission personally that has a connection to the alleged wrong. It's not enough to say you were a supervisor. Well... What about the governor? Can we hold the governor? You're smiling, but... I doubt it, Your Honor. What's the difference between the governor and the director of the Department of Corrections? Well, I think the record shows that there was a systemic problem at this prison, and it went on for a long, long time, including this specific provider, Corizon. It is included in the amended complaint. There's a long history. The Bala case originated in the 1980s. And when Corizon took over to take care of this facility, there's a history of the department assessing hundreds of thousands of dollars of liquidated damage every year for failing to provide adequate staff. I could... I mean, I somewhat understand your theory with respect to Siegert, because she was personally responsible for auditing and watching over them. But all the other people, I don't... I guess I have difficulty seeing on this record what connection they have other than bare supervision, which, as I see the cases, is insufficient. Well, all I will say on that note, Your Honor, is this. When the defendants filed their motion for summary judgment, we asked and noticed depositions of 30B6 of the entity itself and Ms. Siegert, and the defendants filed a motion for a protective order to prevent that from occurring. It never occurred. The court ordered that it should occur, and that's when they took this appeal. So... What are you saying? You have no... Because of that, you have no evidence? Well, Your Honor, I guess... I guess that, yes, I am partly saying that. But that is not an argument you made in the briefing, as I understand it, though, that we can't make a decision because the record is inadequate. I don't think that would be a... I could not make that argument, Your Honor. I mean, I think I'm stuck with the record as it is, and the record as it is indicates that we were on the verge of taking a deposition of Ms. Siegert on a 30B6 of the department when this appeal was taken, and the court below made a finding that there were disputed issues of fact that could go to a jury and that we could finish our discovery. So, in essence, we're here midstream. I don't think that the discovery is concluded. I think that counsel's representation, that we were given an opportunity to conduct the depositions... Nothing has been completed other than the things that the parties wish to do by affidavit sometimes. You know, if I might... I think this comes down to the appellee's argument that they had an adequate machine in place, but what it really is is they're saying, well, this PA who was off-site, who wasn't required to be at the premises on the weekends, made a decision, and her decision was based on the fact that she had read the EKG and didn't actually see it. In her deposition, when she was first shown the EKG for the very first time, she said, well, if I would have seen this, I would have immediately sent him to the hospital. Well, there are some . . . as I understand the state of the case, there are some individuals or at least one individual who is not appealing here who has remained in the case. Is that true or is this everybody? I'm not sure that I understand. Are all the defendants appealing the qualified immunity or only some of the defendants? I think all of them that remain in the case have appealed, and I'll defer to Mr. Collare on that, but I believe they've all appealed. If you're thinking of Ms. Barra, the physician's assistant, she was a Corizon employee. Okay. And so, again, like I said, she testified at her deposition when she was shown the EKG for the first time that had she seen it, had she been on the premises, had they required anyone to be on the premises, he would have immediately been transported. But what we have here is an EKG machine without anyone to read it. So is Corizon still in the case? No, they're not. They're not.  Okay. I go back to what I think this Court said in the Hoptewitt case, which is cited by defendants, that the Eighth Amendment requires prison officials provide a system of ready access to adequate medical care. Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoner's problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can. Such referrals may be to other physicians within the prison or to physicians or facilities outside the prison if there is reasonably speedy access to these other physicians or facilities. In keeping with these requirements, the prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. That's from Hoptewitt 682 F. 2nd, 1237 at 1253. I know that in the briefing there was some argument that the standard that the Supreme Court has recently espoused in the Fourth Amendment arena concerning factually specific cases be present here, but I would point to what's been widely held in Eighth Amendment cases, that for purposes of qualified immunity, a legal duty need not be litigated and established disease by disease or injury by injury. That is a Seventh Circuit case citing to Estelle v. Gamble. But this was, according to the record, the first time that this particular problem had arisen? There was no other mention in the record of someone else who had had a heart attack? That's correct, Your Honor. It's our position that the defendants knew that there was no one on staff over the weekends. I guess the question that Judge Mim has asked goes to whether there's deliberate indifference as distinct from negligence. If it's the first time there's a problem, were they knowing that it was going to be a problem and didn't care? So they may not have realized, I guess, that's the point of the problem. Again, Your Honor, I think the deliberateness of their decision was the decision not to require someone there to be on weekends. It's certainly within their... But they have to know that it may be a problem. They may have, for example, it may be the policy to have two people on duty and one day they need six. But you have to somehow show that they knew that having two would be a problem, not just that they were deliberate in having two. I'm out of time, but I will just respond to your question and then I'll sit down. It's our contention and position, Judge Graber, that any reasonable administrator overseeing this sort of setting would anticipate that someone might have a heart attack after hours or on weekends and that they should have someone on staff at the site who could accurately interpret an EKG, which, as Ms. Barrett testified, had she been on site and seen it, she would have immediately sent him to the hospital instead of five or six hours later. Thank you, counsel. You have a bit of rebuttal time. Thank you, Your Honors. Counsel, in his presentation, made an admission that I think is, that we agree with, that I think is controlling to this entire appeal. They said this whole case comes down to whether or not there was somebody there on the weekends that could personally interpret the EKG strip. So that comes down to the sufficiency or the efficacy of relying upon technology, the electronic interpretation of that EKG study, and providing that electronic interpretation to a medical provider who then has the qualifications, professional qualifications, and the ability within the IDOC system to make the medical decision to transport this individual to the hospital. The question is, what is the intersection under the Eighth Amendment between medical technology and having somebody face a heart attack? And I would point out to you, we put up our brief. There is no case law that I'm aware of nationwide, let alone this circuit, that has addressed this issue. What we do know is in this case, according to the plaintiff's own experts, the medical provider, Ms. Barrett, had all the information she needed to make that initial medical decision to transport this individual to the hospital. Is he monitored at the prison, or is he transported to the hospital? They agree with that. So at that point, whether or not the fact that she had that information and could have and should have made that medical choice is undisputed in this record. And what is... Thank you. I think we understand both parties' positions, and we appreciate the arguments from both counsel. We will take about a 10-minute break and return for our final case. Thank you.
judges: Tashima, Graber, Mihm